IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ANGELA MOORE                                                      PLAINTIFF

v.                                    NO. 4:11CV00174 JLH

ARKANSAS DEPARTMENT OF HEALTH;
and BOB HIGGINBOTTOM                                            DEFENDANTS

## OPINION AND ORDER

Angela Moore filed this action against her former employer, the Arkansas Department of

Health, and her superior, Bob Higginbottom, alleging racial pay discrimination, a racially hostile work

environment, and retaliation in violation of Title VII.  The defendants have filed a motion asking the

Court to dismiss the action under Rule 12(b)(6) of the Federal Rules of Civil Procedure or grant

summary judgment in their favor under Federal Rule 56.  Moore has responded to this motion, and

she has also filed a motion to amend her complaint.  For the following reasons, Moore's motion to

amend is granted and the defendants' request for dismissal is granted in part and denied in part.  The

defendants' summary judgment request is thereafter granted.

## I.

On March 11, 2009, the Arkansas General Assembly passed Senate Bill 437, which proposed

eliminating all then-existing pay and job classifications for state employees and installing a new

classification plan in their place.  On March 22, the Arkansas Department of Health hired Angela

Moore, an African-American, to work in its Protective Health Codes Division as an Administrative

Assistant I.  This was a front-office position that required Moore to collect and process applications

for certain contractor licenses, among other things.  Moore's direct supervisor for her position was

Janice Hill, also an African-American.  Hill reported to Higginbottom, the Protective Health Codes

Division section director.

On March 27, 2009, Arkansas Governor Mike Beebe signed Senate Bill 437, which became Act 688 of 2009. Act 688 amended the Uniform Classification and Compensation Act, and it gave the Office of Personnel Management, a part of the Arkansas Department of Finance and Administration, the authority and responsibility for its preparation and implementation. Neither the Department of Health nor Higginbottom was given final authority over pay plan amounts or grades for specific employees. While they could recommend changes to the pay plan through an appeals process, the ultimate decision belonged to the Office of Personnel Management.

Prior to the implementation of Act 688's new pay plan, Higginbottom received a spreadsheet listing the proposed job titles, pay grades, and salary amounts for Protective Health Codes Division employees. Higginbottom was told by his supervisor to check for any omissions or areas of concern that could merit an appeal to the Office of Personnel Management. Higginbottom recommended three appeals to his Department of Health supervisor. First, he asked for one of his two program directors, a Caucasian, to be increased from a C-119 to a C-121 classification in order to match the other program director, as they had been classified equally under the previous pay plan. Second, he asked for Betty Burleson, a Caucasian, to be increased from a C-112 to a C-119 classification in order to better match her old position and job duties. Third, he asked for Hill's classification to be increased from a C-109 to a C-113 because her position required her to supervise people graded at or above a C-109. For example, Moore's position, in the spreadsheet, was listed as a C-112 even though she was to be supervised by Hill, a C-109. Higginbottom's specific recommendations were rejected, although some of his broader critiques were seemingly accepted. Ultimately, the Office of Personnel Management approved the following changes. First, Burleson's position was increased to a C-117

2

classification.  Second, Hill's position was increased to a C-112 classification.  Third, Moore and Rosalind Crutchfield-Howard, also an African-American, had their positions reduced from a C-112 to a C-109.  Crutchfield-Howard, like Moore, worked directly under Hill.

The new pay plan, which included the aforementioned changes, went into effect on July 1, 2009.  Under the new plan, Hill was classified C-112, and her job title was Administrative Specialist III.  Moore was classified C-109, and her job title was Administrative Specialist II.  The new plan provided for Moore to be paid $22,535.34 annually—a $223.18 increase over her previous pay.  The three other employees supervised by Hill, all of whom performed similar job duties, were also classified at the C-109 level and given the title Administrative Specialist II.  Of the four employees supervised by Hill, two were African-American (Moore and Howard), and two were Caucasian (Ramona Trew and Lisa Collins).  Two Protective Health Codes Division employees who were not supervised by Hill—Stephanie York and Connie Simpson, both Caucasians—were classified at the C-112 level and given the job title of Administrative Specialist III.  Before the new pay plan was implemented, both York and Simpson held the same job title and pay classification as Moore.

After the new pay plan's implementation, Moore began sending e-mails, complaints, and requests to various superiors concerning her classification and pay.  On February 22, 2010, she filed an internal discrimination complaint with the Department of Health concerning her status under the new pay plan.  The next day, Hill issued a "Counseling Statement" to Moore concerning a confrontation between Moore and Collins that had occurred one week prior, on February 16.[1] According to Hill, Moore had begun talking to Collins in "an unfriendly confrontational manner" after

---

[1] In the Department of Health, counseling statements are used when "no disciplinary action will be taken" concerning an employee, but a supervisor has determined "that documentation and correction is necessary."  Document #2-6, at 36.

Collins had checked with Hill concerning a task that Moore had attempted to delegate to Collins. Hill's solution, presented in the statement, was for Moore to run all delegations through Hill and for Moore to handle conflicts in a "positive unconfrontational manner." Moore refused to sign the statement and argued in a subsequent letter that the statement was "fabricated," that a counseling statement should only be issued "if someone was or is violent" or "becomes belligerent or disgruntle[d]," and that it was unfair that Collins did not receive a counseling statement because she was the person who first became belligerent.[2] On March 2, the Department of Health denied Moore's internal discrimination complaint, stating that there was no evidence to support her allegations. Several months later, on May 6, Higginbottom sent Moore an e-mail criticizing her interactions with a different department. Soon after, on May 10, Hill issued another counseling statement to Moore, this time stating that Moore was not processing testing applications on time and that she was misplacing paperwork. Moore again refused to sign the statement. On May 24, Moore received an e-mail from a fellow employee, Spencer Plumley, stating that Higginbottom had recently pulled him aside and told him that Moore was "bad news" and that it "would be best" if Plumley did not "have anything to do with [Moore]." Finally, in early July 2010, Higginbottom verbally criticized Moore for the way she was handling her phone duties.

Moore resigned from her Department of Health position in early August 2010. In her declaration, she states that she did so because she "no longer [felt] welcome at the Department of Health," as "[a]ll of the mistreatment, discrimination, and retaliation that I suffered between February

---

[2] Notably, Moore's letter is self-contradictory. On one hand, it states that the "entire [counseling statement] is basically untrue." On the other hand, Moore confirms the initial circumstances of the altercation as presented in Hill's statement; that is, that Moore delegated a task to Collins, Collins checked with Hill, and Moore then confronted Collins about her doing so. Document #2-6, at 38-40.

and July took a heavy toll on me emotionally."  She filed her original *pro se* complaint in this action

against Higginbottom and the Department of Health on February 23, 2011, alleging a racially hostile

work environment, racial pay discrimination, and retaliation under Title VII.  On January 13, 2012,

the defendants filed a combined motion to dismiss and motion for summary judgment.  On February

3, 2012, Moore was appointed an attorney, and on March 29, Moore filed a motion to amend her

complaint.  The next day, she filed a response to the defendants' aforementioned combined motion.

Four days later, on April 4, Moore filed a motion to proceed *pro se*, which the Court granted.[3]

## II.

In their Rule 12(b)(6) motion to dismiss, the defendants argue that the claims against

Higginbottom, as an individual, are not cognizable under Title VII, and that the original complaint

fails to state a claim upon which relief could be granted.  In her response, Moore concedes that

Higginbottom is not a proper defendant. *See* Document #48, at 1 n.1 ("[Moore] has withdrawn her

claims against Higginbottom . . . ."); Document #46-1, at 1 (listing only the Department of Health

as a defendant in the amended complaint).  Higginbottom will therefore be dismissed from the action.

*See Schoffstall v. Henderson*, 223 F.3d 818, 821 n.2 (8th Cir. 2000) (individual supervisors are not

personally liable under Title VII).

In the interests of justice, however, the Court will grant Moore's motion to amend her

complaint.  Federal Rule of Civil Procedure 15(a)(2) states that a court should freely permit a party

to amend its pleading at any time before trial if "justice so requires."  In the present case, it would

indubitably be unjust to force Moore to stand by her original *pro se* complaint when she has provided

---

[3] Since then, Moore has also filed a motion requesting that her subpoenas be served by law
enforcement.  *See* Document #55.

the Court, through an appointed attorney, a more developed, coherent, and legally sound amended complaint.[4]  Perhaps recognizing this, the defendants have not objected to Moore's proposed amended complaint.  Therefore, the Court grants Moore's motion to amend.  The Court denies the rest of the defendants' Rule 12(b)(6) request for dismissal, which was filed before the motion to amend and based largely on alleged defects contained in the original *pro se* complaint.[5]

### III.

In addition to requesting dismissal under Rule 12(b)(6), the defendants have moved for summary judgment under Rule 56.  Moore primarily opposes this motion on the basis that it is too early, as no discovery has yet to take place in the action.  While it appears to be true that no discovery has taken place, it is still appropriate for the Court to analyze the defendants' request for summary judgment.  This is so for several reasons.  First, this action has now been pending since February 23, 2011—nearly 16 months.  There has been ample time for discovery.  *See Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 922 (8th Cir. 2010) ("Although discovery does not have to be completed before a district court can grant summary judgment, 'summary judgment is proper only after the nonmovant has had adequate time for discovery.'" (citation omitted)).  Second, in her original complaint Moore

---

[4] It makes no difference that the motion to amend was filed after the defendants filed a combined motion for dismissal and summary judgment.  *See Rutenschroer v. Starr Seigle Comms., Inc.,* Civ. No. 05-00364, 2006 WL 1554043, *11 (D. Haw. 2006) (collecting cases where "[f]ederal courts have allowed pro se plaintiffs to file amended complaints or supplemental oppositions in response to motions for summary judgment").

[5] Admittedly, the Court may construe a motion to dismiss as applying to the proposed amended complaint, even though it was filed beforehand.  *See, e.g.*, *Reddy v. JPMorgan Chase Bank, N.A.*, No. 2:09-cv-1152, 2010 WL 3447629, at *4 (S.D. Ohio Aug. 30, 2010) (construing defendants' motion to dismiss as applying to the proposed amended complaint).  Even if so construed, however, the defendants' motion to dismiss would still fail, as Moore's amended complaint successfully states claims for which relief could be granted.

attached nearly 500 e-mails, records, and other related documents, many of which she appears to have

obtained through Arkansas Freedom of Information Act requests.  These documents and a subsequent

affidavit and declaration by Higginbottom and Moore, respectively, provide the Court with sufficient

information for summary judgment purposes.  Third, in her response to the defendants' summary

judgment motion, Moore argues that the Court should delay ruling because "Moore was recently

appointed counsel." Document #48, at 11.  Since this filing, however, Moore has successfully

petitioned the Court to again proceed *pro se*, as she has done for the majority of the action.  *See*

Document #53.  As such, this argument is no longer valid.  The Court will proceed to the merits of

the case.[6]

A court should enter summary judgment if the evidence demonstrates that there is no genuine

dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct.

2505, 2511, 91 L. Ed. 2d 202 (1986).  The moving party bears the initial responsibility of

demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If the moving party meets this burden,

the nonmoving party must respond by coming forward with specific facts establishing a genuine

dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

In deciding a motion for summary judgment, a court views the evidence in the light most favorable

to the nonmoving party and draws all reasonable inferences in that party's favor.  *PHL Variable Ins.*

*Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008).  A genuine dispute exists only if

---

[6] Moore admits in her response that Federal Rule 56(d) (which she labels as "Rule 56(f)") "seemingly does not apply" to the present situation.

the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  When a nonmoving party cannot make an adequate showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

In the absence of direct evidence, discrimination claims pursuant to Title VII and 42 U.S.C. § 1981[7] are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See Young–Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 n.3 (8th Cir. 2008) (same analysis is used for Title VII and § 1981, as they "set forth parallel, substantially identical, legal theories of recovery").  Under the *McDonnell Douglas* framework, a plaintiff must first create an inference of unlawful discrimination by establishing a prima facie case of discrimination. *Fields*, 520 F.3d at 864.  The burden then shifts to the defendant to state a legitimate, nondiscriminatory reason for its actions. *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011). Once the defendant gives such a reason, the burden shifts back to the plaintiff to show that the stated reason is a pretext for discrimination. *Id.*

A. *Racial Pay Discrimination*

In order to establish a prima facie case of racial pay discrimination under Title VII and 42 U.S.C. §1981, Moore must show that: (1) she belongs to a protected class; (2) she was meeting the Department's legitimate expectations; (3) she suffered an adverse job action; and (4) the Department

---

[7] While Moore's amended complaint does not change her original three claims, it does add that they are being brought under § 1981 in addition to Title VII.

treated similarly situated employees who were not part of the protected group more favorably. *Chappell v. Bilco Co.*, 675 F.3d 1110, 1118 (8th Cir. 2012). In analyzing the fourth prong, a court must "consider whether the comparators are 'similarly situated in all relevant respects.' " *Id.* at 1119 (further defining "relevant respects" as "the conduct of the employees and any disparity in their discipline"). Even assuming that the first three prongs are met, Moore cannot establish a prima facie case because she has provided no evidence that the Department of Health treated similarly situated non-African-American employees more favorably than her.

Moore argues that she was similarly situated to Caucasian employees York and Simpson**,** who were classified under the new pay system at the C-112 level whereas Moore was classified as a C-109. The Department of Health responds in part by providing evidence that Moore was re-classified as a C-109 because the Department considered it inappropriate for her to be classified at a higher level than her supervisor, Hill, who was originally classified a C-109. *See* Higginbottom Aff., Document #32, at ¶¶ 5-8. In order to deal with this problem, Hill was eventually raised to a C-112 at the same time as Moore was lowered to a C-109. *Id.* Importantly, the other three persons under Hill's supervision—Crutchfield-Howard, Collins, and Trew—were also classified at the C-109 level. *Id.*; *see also* Document #2-1, at 18-19 (Department of Health response to Moore's internal discrimination complaint). York and Simpson, though they may have performed some similar duties, were not under Hill's supervision. *See* Document #2-6, at 26 (Protective Health Codes organizational flow chart); Document #2-1, at 19 (Department of Health: "The fact that other employees outside of your immediate work section are paid more than you or are at a higher grade than you has no relevance in this matter."). As such, they were not similarly situated in all relevant respects to Moore. *See Fields*, 520 F.3d at 864-65 (two employees not similarly situated because

9

they had different supervisors); *Johnson v. Univ. of Iowa*, 431 F.3d 325, 330 (8th Cir. 2005) (two employees not similarly situated in part because they reported to different supervisors); *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("Employees with different supervisors . . . generally will not be deemed similarly situated."). Not only has Moore not shown York and Simpson were similarly situated to herself, but the Department also has demonstrated that the four persons under Hill's supervision were all given identical classifications under the new pay plan.

Even if Moore could demonstrate that Simpson and York were similarly situated and establish a prima facie case of racial pay discrimination, the Department of Health has provided a legitimate, nondiscriminatory reason for its action. The Department's reason is this: it treated Moore as a C-109 because it was required to do so, as it does not actually control Moore's pay rate and classification. Rather, the entire system was set by the Arkansas General Assembly and the Office of Personnel Management. *See, e.g.*, Ark. Code Ann. § 21-5-207(a)(5)(A) (noting that, among other things, the Office of Personnel Management must "review all class specifications and all classes and grades and the compensation plan affecting all state agencies and institutions," and it must "submit to the Legislative Council and the Governor . . . recommendations for revisions, modifications, or additions"); *id.* § 21-5-208 (classifying positions and grades); *id.* § 21-5-209 (assigning salary amounts and pay grades); *id.* § 21-5-210 ("[T]he General Assembly determines that the class specifications prepared by the Office of Personnel Management . . . shall be the class specifications to be followed . . . . Changes in class specifications may be made, in whole or in part by regulation of the office . . . ."); *id.* § 21-5-211(a) ("The Office of Personnel Management shall have administrative responsibility for enforcing compliance by state agencies and institutions affected by this subchapter in implementing classification and grade changes."); Higginbottom Aff., Document

#32, at ¶ 4 ("The State's Office of Personnel Management (OPM) implemented a new pay plan . . .

based on applicable job descriptions and length of service."); *id.* at ¶ 6 (stating that the pay plan

appeals process was limited and that the Office of Personnel Management "makes the final decisions

on appeals of the pay plan").  Instead of bringing forth evidence to contradict this, Moore has actually

provided some evidence to support it.  For instance, Moore attached to her original complaint her

description of a Dec. 15, 2009, conversation with Higginbottom:

> [Higginbottom] advised me that he had tried to get me more money than he
> anticipated but it wasn't approved. . . . He said that the sheet that he got is what he
> had to deal with. . . . He tried to give me justification as to . . . how OPM did it.  He
> said that it's embarrassing about how the pay plans ended up. . . . [H]e said that he
> didn't know how to begin to get the rate of pay fixed.

Document #2-1, at 3-4; *see also* Document #2-4, at 5 (Higginbottom: "I have no power to write a

pay plan as Ms. Moore states."); Moore Decl., Document #49-1, at ¶ 4 ("In July 2009, the State of

Arkansas instituted a classification system for state employees.").[8]  Thus, to summarize, the

Department of Health has provided a legitimate, nondiscriminatory reason for why it treated Moore

the way it did—it was required to do so.

Moore tries to avoid this conclusion, which the Court will construe as an attempt at

---

[8] The only items provided that could even be remotely construed to contradict the defendants' evidence are various statements by Moore, scattered throughout the record, accusing Higginbottom of writing the pay plan and promising her that he could fix the problem. *See, e.g.*, Document #2-1, at 15 (Moore: "Ultimately I believe that [Higginbottom] wrote the plan . . . ."); Document #2-7, at 97 (Moore: "Bob had decided that he was going to give me the money . . . .").  No evidence in the record, other than Moore's own vacillating assertions, even remotely suggests that Higginbottom wrote the pay plan.  Furthermore, Moore's claim that Higginbottom told her he would fix the problem and give her the extra pay she was asking for appears to be a misinterpretation of what he actually said.  According to Moore's own notes, Higginbottom indicated that he would attempt to find a solution *if* possible. *See, e.g.,* Document #2-1, at 5 ("[Higginbottom] assured me that it's been such a huge problem that he's willing to do whatever [it] takes to get it fixed because he said that he didn't know how to begin to get the rate of pay fixed.").

demonstrating pretext,[9] by arguing that while "the Department did not have the authority to increase an employee's classification without appealing the issue to [the Office of Personnel Management], it had the ability downgrade an employee's classification." Document #48, at 2; *see also id.* at 7 ("Higginbottom's affidavit . . . establishes that the Department downgraded Moore's position from a C112 to C109." (citing Higginbottom Aff., Document #32, at ¶ 8)).   Moore misconstrues Higginbottom's affidavit, which is the only evidence she points to support this assertion.   While Higginbottom does admit that Moore and Crutchfield-Howard were both reduced to a C-109 classification, he nowhere states that the Department of Health had final say over the decision. Higginbottom Aff., Document #32, at ¶ 8.   In fact, two paragraphs prior he states the opposite: that the Office of Personnel Management "makes the final decisions on appeals of the pay plan." *Id.* at ¶ 6.   Moore has fallen far short of demonstrating pretext.   *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012) ("The showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for an employment action. A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." (internal marks and citation omitted)).

B. *Racially Hostile Work Environment*

To establish a prima facie case of hostile work environment under Title VII and 42 U.S.C. § 1981, Moore must present evidence showing that (1) she is a member of a protected class; (2) she was subjected to unwelcome race-based harassment; (3) the harassment was based on her membership in that protected class; and (4) the harassment affected a term, condition, or privilege

---

[9] The Department does not actually present its "lack of control" argument as providing a legitimate, non-discriminatory reason.  The Court, however, believes that is where it best fits, thus it will analyze Moore's responses to this argument as attempts to demonstrate pretext.

of employment. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010).   In general, Moore must demonstrate that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083 (8th Cir. 2010) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).   The standard is both subjective and objective; Moore must show that she actually perceived the environment as abusive and that a reasonable person would find the environment to be hostile. *Id.*   To determine whether the objective component is met, the Court must "look to the totality of the circumstances, 'including the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive utterance and whether the conduct unreasonably interfered with [Moore's] work performance.' " *Anderson*, 606 F.3d at 518-19 (citation omitted).   The Court must "also 'consider the 'physical proximity to the harasser, and the presence or absence of other people.' " *Id.* at 519.   These high standards are intended to " 'filter out' those complaints concerning the 'ordinary tribulations of the workplace,' " such as "[s]imple teasing, offhand comments, and isolated incidents . . . ." *Id.*

The evidence provided by Moore fails to demonstrate that a racially hostile work environment existed.   Moore's primary alleged incident of harassment appears to be the same as her previous claim; that is, that Higginbottom "harassed" her by racially discriminating against her in regards to her pay and classification.   For the reasons detailed above, this claim fails.

Next, Moore alleges that Higginbottom harassed her by treating her and other African-American employees differently from Caucasian employees.   Specifically, Moore states in her

declaration that Higginbottom took walk breaks away from African-American employees while allowing at least one Caucasian employee to continue them.   Additionally, she states, Higginbottom allowed Caucasian employees to take unlimited smoke breaks.   Nothing within the nearly 500 pages of evidence, outside of Moore's own say-so, supports these allegations.   On the contrary, various e-mails in the record cut strongly against her position. *See, e.g.,* Document #2-6, at 53 (Higginbottom: "I am concerned about these continued claims that our office is not treating people 'fairly.'   This deeply bothers me because I work very hard to see that people are treated equally and fairly. . . . I will use whatever resources available to me to insure that all people are treated fairly."); *id.* at 63 (Higginbottom: "I am not against breaks/walking.   I only want to make sure that everyone is treated equally under the agency policies and procedures.").   Moore's declaration, which is self-serving and contradicted by a voluminous record, is insufficient to permit the Court to find in her favor concerning these specific allegations. *See Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits."); *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

Furthermore, most of the incidents actually supported by the record do not amount to actionable harassment. For instance, while Moore construes four occurrences—detailed in the above factual section—as "mistreatment" and "discipline," the evidence demonstrates otherwise.   Two of the four instances involved counseling statements with no penalties or discipline attached. *See* Document #2-6, at 36, 41.   The third incident was an e-mail from Higginbottom criticizing Moore—in measured, polite terms—for actions pertaining to a job duty. *See* Document #2-8, at 68.

14

The fourth was an in-person critique, by Higginbottom, of Moore's phone-answering tactics. *See Moore Decl.*, Document #49-1, at ¶ 13. Thus, even assuming that Moore was unfairly criticized, these instances appear to be textbook examples of "ordinary tribulations of the workplace." Title VII simply does not provide employees with a right to be vindicated from mistaken criticism. *See Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999) (unfair criticism and yelling, "while not desirable, do not amount to actionable harassment"), *abrogated on other grounds by Torgerson*, 643 F.3d 1031; *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 810 (8th Cir. 2008) (collecting cases).[10]

Finally, Moore provides evidence that Higginbottom told another employee at one point that Moore was "bad news" and that it "would be best" if the employee did not "have anything to do with [Moore]." Document #2-6, at 65. One isolated incident of actual harassment, however, does not make a work environment hostile, even if the plaintiff subjectively believes it so. *See Anderson*, 606 F.3d at 519. Moore has failed to demonstrate that she suffered objectively severe harassment.[11]

Moore has also failed to demonstrate that any activities alleged to be harassment that are

---

[10] Moore does state in her declaration that her superiors initiated these incidents with the intention of retaliating and discriminating against her. Moore provides no evidence, however, to support these specific statements pertaining to intent, and her phrasing indicates that she is stating subjective, speculative beliefs, as opposed to facts derived from personal knowledge. *See, e.g.*, Moore Decl., Document #49-1, at ¶ 13 ("I believe that Bob Higginbottom made the incident such a big deal to retaliate and discriminate against me."). Thus, the Court need not treat them as evidence. *See Gallagher v. Magner*, 619 F.3d 823, 842 (8th Cir. 2010) ("[A]ffidavits must be made on personal knowledge, must set forth facts which would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated." (citation omitted)).

[11] Even if the Court accepted all of Moore's substantiated and unsubstantiated allegations as true, it is unlikely that the activity charged therein would amount to a hostile work environment. *See, e.g.*, *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476-77 (8th Cir. 2005) (no hostile work environment where supervisors treated African-American plaintiff differently and less respectfully than Caucasian employees and referred to him by racial terms such as "tan" and "dark").

substantiated by the record were based on race.  Nothing in the record indicates that the counseling statements, criticisms, office regulations, or Higginbottom's warning to Plumley, were issued because Moore is African-American.  The Court will grant summary judgment to the defendants on Moore's hostile work environment claim.

*C. Retaliation*

In order to establish a prima facie case of retaliation under Title VII and 42 U.S.C. § 1981, Moore most provide evidence that: (1) she filed a harassment charge or engaged in other protected activity; (2) her employer subsequently took an adverse employment action against her; and (3) the adverse action was causally linked to the protected conduct.  *Cross v. Cleaver,* 142 F.3d 1059, 1071 (8th Cir. 1998).  An adverse, or "tangible," employment action is one that involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1144 (8th Cir. 2007) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998)).

Even assuming that Moore engaged in protected activity, she has provided no evidence that the Department of Health, or any of her superiors, took an "adverse employment action" against her.  As noted above, the two counseling statements from Hill were not disciplinary in nature; indeed, there were no penalties attached to those statements at all.  And a critique of one's work performance—whether by e-mail, by counseling statement, or in-person—simply does not constitute an adverse employment action.  *See Carpenter v. Nw. Airlines, Inc.*, 47 F. App'x 424, 426 (8th Cir. 2002) ("Northwest's critique of Carpenter's poor job performance was [not] an adverse employment action."); *Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010) (supervisor's oral criticism of

employee's performance as "borderline unacceptable" was not a materially adverse action).

Moore does allege that she was constructively discharged from her position, which would constitute an adverse employment action. *See Brenneman*, 507 F.3d at 1146. To maintain a constructive discharge claim, Moore "must demonstrate that: '(1) a reasonable person in her situation would find the working conditions intolerable and (2) [her] employer ... intended to force [her] to quit.' " *Id.* at 1144 (quoting *Tatum v. Ark. Dep't of Health,* 411 F.3d 955, 960 (8th Cir. 2005)). Regarding the second prong, Moore must either demonstrate that her "employer intended to force her to quit" or that it could have reasonably foreseen that she would quit as a result of its actions. *Id.* (citing *Wright v. Rolette Cnty.*, 417 F.3d 879, 886 (8th Cir. 2005)).

Moore can meet neither of these prongs. Largely for the same reasons discussed in regards to a hostile work environment, Moore cannot demonstrate that a reasonable person would have found her working conditions intolerable. As to intent, Moore provides the following e-mail from Higginbottom to Hill and others, arguing that it shows his intent to get her to quit:

> Angela Moore called in today and told Janice Hill over the phone that she was still sick but that she has no intention of completing the FMLA paperwork. She said that she was NOT coming back to work for us ... that she would not be back. Janice asked for something in writing and they agreed to an email, but we have not received the email as of yet. She further insinuated that she had another job. Is this enough to terminate her or do we need to wait on the email?

Document #2-6, at 67. A reasonable reading of the e-mail reveals nothing of the sort, as Higginbottom is clearly and understandably trying to figure out how to deal with an employee who has already made it known that she has no intention of returning to work. Moore has not provided evidence sufficient to create an issue of fact as to constructive discharge.

In summary, Moore was not hired, fired, or reassigned, and the Department of Health did not

fail to promote her[12] or change her benefits. Thus, she has not suffered an adverse employment action and cannot make a prima facie case of retaliation. Summary judgment is granted.

## CONCLUSION

For the foregoing reasons, Moore's motion for leave to file an amended complaint is GRANTED. Document #46. The defendants' request for dismissal under Rule 12(b)(6) is GRANTED in regards to Higginbottom as an individual and otherwise DENIED. Document #32. The defendants' request for summary judgment is thereafter GRANTED. Document #32. All of Moore's claims against Bob Higginbottom and the Arkansas Department of Health are DISMISSED with prejudice. Moore's motion to request subpoenas is DENIED as moot. Document #55.

IT IS SO ORDERED this 15th day of June, 2012.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[12] To the extent that Moore could argue that the failure to pay her sufficiently because of her race was a "failure to promote" her, this argument would fail for the same reason as mentioned above—there is no evidence to support the claim.

18